The 4th District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning. We are here on People v. McBride. That is case number 4-220301. Would counsel for the appellant please identify yourself for the record. Luke McNeil. Thank you, Mr. McNeil. And for the appellate counsel, will you please state your name for the record. Amy Kemp. Thank you. Mr. McNeil, you now may proceed with your argument. May it please the court, counsel. Here's a brief recap of the facts. Defendant was charged in August of 2020 with multiple counts. I apologize for interrupting you. We are familiar with the facts. And if you want to incorporate them as part of your argument, that would be fine. But personally, I have a number of questions. If you want to start first, but avoid the facts, that would be fine. Thank you, Your Honor. As to the standard of review, defendant here accepted the truth of prosecutor's avow at the compulsory joinder hearing. As to the first test being negative for THC and as to the later test being positive for THC. In fact, the defendant went so far as to object to the actual test results being admitted into the record at that hearing. So there is no factual dispute here. There are no credibility findings that this court needs to concern itself with. In other words, this court is in the exact same position as the trial court to determine this issue on appeal, which is a pure question of law. So de novo review would be appropriate here. Counsel, if I could ask you a question regarding the test results. On page 11 of your brief, you assert and state that the defendant's initial drug screening was negative for THC. I believe you just mentioned that. However, there is no citation to the record for that proposition. Where in the record does it specifically provide or say that the defendant was tested for THC in her initial screening? They're only the testimony of the officer who says that he heard and that the prosecutor avowed the same thing that he, that the initial drug test done the night of the crash was negative for the defendant. But we don't know that the defendant was tested for THC specifically, do we? No. And I would say that the, I don't think that was in dispute. I don't, I think that the prosecutor and defense counsel agreed as to what the issues were at this hearing. I don't think that there was an issue about the test only or not testing for THC or something like that. I think that the, and again, the test results could have been admitted into evidence as the prosecutor wanted. Defendant objected to that and said, I believe the prosecutor and what they're saying and accepted the prosecutor's avow as to the facts of both tests. And yeah. But you do say later in your brief that it was a surprise to the prosecutor that the Yes. So how was that consistent? What you said, or what is at page 52 of the sealed record here that we, the prosecution had a suspicion that the defendant was under the influence. The, because the defendant in her discussion with the officer that night stated she had marijuana at some point earlier before the crash, but then quickly recanted that. That, that presumably was the suspicion. She didn't recant that. Did she? That recant. She was asked if she was under the influence. She quickly said yes and she recanted that. Isn't that what the record shows? Maybe I've misread the record, but I remembered it a little bit differently. So I think in the, I may be wrong too. I don't have the record in front of me, but the, I think the officer specifically testified as to her smoking cannabis. It might've been more general under the influence thing, but I think it was about marijuana that the officer testified to, but then she quickly recanted that admission to the officer. So, but that, that suspicion was quickly resolved by the drug test that was negative at the time of the night of the crash. The initial suspicion that the state or that, that officer had, obviously the more concrete, stronger evidence was the negative drug test that said, okay, well, she, she doesn't have THC in her system. That's even stronger, I would say, support for the state's position than, than people versus Sykes where the, the officer there testified he had a suspicion that, that the defendant Sykes might have been under the influence of drugs. The appellate court held that wasn't enough. They held that without the results of the urine test, the suspicion that the officer had would not have been enough to give the state a reasonable chance to secure a conviction. I would say in, in this case, we don't even have a, we don't have an even unreasonable chance of securing a conviction based on the fact that the, the one drug test that was done at the time of the commencement of the prosecution reflected that defendant was negative for THC. Well, this case is different than Sykes in the fact that we did have this admission by the defendant that five minutes before she left her home, she did smoke marijuana and that, that was not, again, my recollection is very different than yours counsel and that while, and that she did admit that she was under the influence, but recanted that, that isn't the situation in Sykes. So Sykes is distinguished, excuse me, in that respect, is it not? Sykes, there was an admission by the defendant as well about being under the influence. And I don't know, I think there was even a recanting of that in Sykes as well. I can't, I'm not sure, but there was an admission from the, the defendant in Sykes. The only delay in that case was due to a labeling mix up at the hospital. That's why the state didn't have the, the results of the test in there. But the important part is that there was no negative drug test in Sykes. There was nothing for the, there was nothing to contradict the suspicion the officers had in Sykes as there is in this case. We, we have a, an unreasonable, not even an impossible chance to secure a conviction on this at the time of the the second test did not come back until the earliest to both parties, December of 2020, months later. Now it's true that the state did not add this charge till January of 2022, but that was clearly not done for any tactical advantage or any trial by ambush sort of thing. Both parties had the results of this drug test since December of 2020 and the state. But it was the state prerogative to bring charges and they waited months. They waited till a month before the trial, even though they had the results. Isn't that correct? Yes. And I, the agree there, there were multiple agreement, agreement, agreed continuances based on defendants requests during the year that proceeded as well as the, the COVID pandemic. I don't know if that came into play during whatever delays there were, but this was clearly not a defendant chomping at the bit to get to, to trial. This was not a speedy trial situation due to her agreeing or requesting multiple continuances, even after the, the charge was briefed. This was not a, a situation where defendant had to choose. This was more than a year and a half after the initial commencement of the, of the prosecution. So again, that, that's what the trial court distinguished Sykes from is that the, the, the prosecutor in Sykes requested a speedy trial extension. In that case, it made sense to, because it was, there was nothing contradicting the suspicion of the officer in that case here. This, there wasn't, there wasn't, there's nothing in the record that suggests the first test was faulty and presumably any speedy trial extension would have been objected to defense counsel saying, Hey, my client's speedy trial rights shouldn't be violated based on a fishing expedition for this second, this second test. Second drug test comes back months later. And at that point more months passed before defendant is ready for trial. And so I would say that any speedy trial, the speedy trial extension in this case would have been meritless or fruitless because due to the first initial drug test being negative. And your honor, as, as for the lack of specificity as to what the drug tests showed, again, I don't think that the state is responsible for that. The state attempted to put the drug test results into the record defendant objected and instead accepted the prosecutor's word. And that should be not resolved against the state here. And especially since there's no dispute, defendant did not attack the fact that there was no THC tested for on the first test or anything like that. Defendant simply attacked the fact that this was a speedy trial violation due to compulsory joinder. Well, the defendant was demanding a speedy trial at the time that the state did file the new charge. I mean, how could this not be interpreted as suggesting that the state filed this new charge to get the defense to acquiesce to another delay? And how is that consistent with the spirit of the speedy trial statute to allow the state to bring this new charge over 500 days after this defendant been taken into custody? Again, I'm not sure why there was such a gap between when the drug test results came back and the new charge. But I think the record reflects that this was not, again, not a tactical move by the state. I don't know why they waited so long, but there were continuances by defendant's request after January 2022, both for preparation for trial and for preparation for this compulsory joinder hearing. The state agreed to all of them. It was not a trial by ambush situation, especially since both parties had had the results of that second drug test for over a year at that point. The plain language of Section 3-3 and the prosecutor pointed this out to the trial court, there's no time limit as to when the additional charges have to be filed. Section 3-3 is silent on when those have to be filed. The crucial point in time is the commencement of prosecution. At that point, if the prosecutor has knowledge of the additional offenses, they have to file them at that point. If they don't, there's no time limit and I don't think any authority cited that says that when this has to be, when the additional charges. They had the knowledge in December, but they didn't file them then. They waited until April, 30 days before trial. Isn't that correct, counsel? At 30 days as to when the trial was scheduled at that point, yes. I mean, the trial, I think, had been scheduled prior to that in the record before. Again- They did ask for continuances to get another expert, isn't that right? Yes, but defendant had requested, I would say, three times the amount of continuances that the state asked for in that over a year and a half between the commencement of the prosecution. The point being that this would, I think, would be the first trial court to say that there is a time limit as to when those additional charges have to be filed and that would be, I would submit improperly reading language into section 3-3 that isn't there. Mr. McNeil, I want to cut in there because you seem to be avoiding or not taking in consideration the Williams rule when interpreting the statute. You're familiar with that, correct, the Williams rule? Yes, I think so. So, it's not so much that this court would somehow potentially be imposing some type of timeline in that these continuances were taken when the matter was already charged, it's states on notice at some point and it's whether or not the state took action at the appropriate time. Well, there needs to be some sort of prejudice, correct, to the defendant? And Luciano and Sykes, like I said, there's no trial by ambush situation here and I think that's what Williams... Williams speaks more to the knowledge of whether or not, you know, when the prosecuting team, officers, etc. knew of these facts that they needed to take action with regard to. Is there a specific, I don't, did they discuss a specific limit or time limit to as to when the additional, when the prosecutor has knowledge, when the additional charges have to be filed? Well, it's implied it's got to, you know, this all has to take place and be done before the 120 days runs. If it's subject to compulsory joinder? Correct. And I would submit that the plain language of the compulsory joinder statute that applies here, it's not. The prosecuting officer did not have the knowledge or reasonable chance to secure a conviction at the time of the commencement of the prosecution here. So, the compulsory joinder statute does not apply as to this charge. Mr. McCall, I had a question if you could clarify for me. Is part of your argument that the delay in adding the extra count after the THC results were known to the state, that makes no difference because that was a several month delay there, but that's not something this court should be concerned with. Is that your argument? I don't think so because there, I mean, if there was some kind of, if the record suggested some kind of tactical maneuver by the state in doing this, I think it would be more applicable, but here there isn't. Like I said, this case had been going on for more than a year at the time of the charges, of the additional charge being added, as well as another continuance to get ready for this compulsory joinder hearing. I don't think defendant was, like I said, defendant was not chomping at the bit to get this, get to the trial in this case. And I think that is definitely applicable to the circumstances here. Again, this is unique due to the negative test that the prosecutor had to rely upon when commencing these charges. I think it would be looking at it the other way, reckless for the prosecutor to have charged defendant with aggravated DUI based on THC at the time of the commencement of the prosecution, knowing the drug test was negative. And again, the circumstances of this case is unique, and I would say even stronger support than Sykes. And I think the trial court erroneously distinguished that case. And the trial court erroneously ignored the plain language of section 3-3 that does not require the additional charges to be brought in any certain time. There was no prejudice to defendant here. And pursuant to that plain statutory language, Luciano and Sykes, I would argue that the trial court's dismissal was error here. Is it your position that the state can never have knowledge as required of a DUI offense for purposes of the compulsory joinder staff until the state has received confirmatory test results? Exactly. No, Your Honor. We have a negative test here. That's the circumstances that are different from any other case. A negative test of what? THC. I mean, I think we have to presume that. Where is that in the record? If it's not presumed by this court to be in the record, I would say that it's affirmatively waived by defendant for objecting to the test results even being part of the record. I mean, the state wanted to put them in. They're not in. There's no issue. The defendant didn't argue that this was somehow an erroneous second test or an erroneous first test or that the THC was not tested for in the first test. Those are not arguments that the defendant made in this compulsory joinder or speedy trial violation argument. So I don't, I think it would be improper for this court to presume that THC was not tested for in that first drug test because, again, nothing in the record indicates that that was a point of dispute by either party. So I think it's safe to presume that that first drug test tested for THC. So you're saying that invited error acquiescence applies to the appellee here in this case? It was the defendant's burden at the trial level to make the speedy trial violation argument. Like I said, the prosecutor attempted to get the drug test results into the record. Defense counsel objected, said, hey, I believe what the prosecutor is saying. And I think that should be enough on appeal that, again, if there was any tested on the first test of the second test, there would presumably be that argument in defendant's motion. There was not. So I don't think that the prosecutor was lying and saying that there was a negative THC test. And defense counsel didn't think prosecutor was lying either. Defense counsel accepted the prosecutor at his word. And I think that's important for this court to recognize when looking at this issue. Okay. Thank you, Mr. McNeil. You will have rebuttal. Ms. Kemp. Good morning. May it please the court. My name is Amy Kemp. I represent the appellee Natasha McBride. More than 500 days after Ms. McBride was taken into continuous custody on litany of criminal charges arising from a motor vehicle collision and less than a month before her scheduled jury trial began on those charges, the charging document was amended to bring a new and additional charge threatening a presumptive 6 to 28 years in prison. Ms. McBride was faced with what our Supreme Court has called a Hobson's choice between a trial without adequate preparation and further pretrial detention to prepare for trial. That is, excuse me, Ms. Kemp. Good morning. I have a number of questions, so I apologize for interrupting. In your view, how can the state have a reasonable chance to secure a conviction, and I'm referring to some of the language in People v. Luciano, for driving under the two responses there. The first, accepting the Luciano standard for knowledge for the purposes of the answer. The state had Ms. McBride's admission, and contrary to what has been suggested this morning and some of the briefing, most of that admission was unrecanted. Just as your recollection of the record is correct, the questioning of the officer at the dismissal motion hearing shows that Ms. McBride recanted only the portion of the admission that she was under the influence while driving, not the portion of the admission that she smoked cannabis approximately five minutes before driving, and that's at pages 37 to 38 of the sealed report of proceedings. The state had that admission. That's, of course, powerful evidence that the defendant did, in fact, drive with cannabis in her system. The state also had something that hasn't been mentioned yet this morning, which is two different peace officers' objective observations of signs that Ms. McBride was under the influence of some drug. They testified to restlessness, uncontrollable tremors in her legs, repetitive and fast speech, general talkativeness, and elevated body temperature and heart rate. You have, of course, her involvement in the motor vehicle collision itself and the evidence the state had or believed it had that she was at fault for that collision. And finally, you have the state's knowledge that they have collected four further testing samples of Ms. McBride's blood and urine. So they knew at the time of the charging decision that they already possessed the physical basis from which they could adduce admissible testimonial documentary evidence that she was driving under the influence. So all of those things give the state enough knowledge at the time of its charging decision to trigger compulsory rejoinder under even the Luciano standard. My second response to that itself, the state has suggested in its briefing before this court that that standard is somehow binding or well settled, and it is not. You have basically a couple lines of cases here. You have the Luciano standard and Sykes applying Luciano, but you also have this other line of cases that the state would prefer to ignore, and that's the Dismuke, I'm not sure how to pronounce that, and the Thomas case that talk about how knowledge of the possibility is sufficient to trigger compulsory rejoinder, at least under certain circumstances. We have these competing standard from the competing line of cases, and those cases are equally, I don't want to say binding, neither line of cases is binding on this court. And so I would ask the court to perform its own statutory construction on section 33, reject the Luciano standard, and embrace the legislative intent here. Counsel, with regard to the Dismuke case, if we read that case closely, the issue in Dismuke was not the issue that Justice Burkett discussed in the Luciano case, which was the what constituted the same act, in other words, different language that was in subsection B. And in fact, in that opinion, the court, and I happen to have been the author of that case, indicated that we examine the committee comments for section 33, which explained that the phrase, the same act was designed to describe the situation in which several persons are affected by only one act of the defendant. And what the court was looking at in that case was whether evidence of possession of cannabis and of the handgun was part of the same act, and how that implicated the compulsory rejoinder issue. The court then did acknowledge at a later time in that knowledge of the offenses. There is the use, I acknowledge, of the word possibility in paragraph 22, but in indicating that this Dismuke case stands for a second line of cases, I'm wondering if, is that too broad a reading under the fact that the issue in Dismuke was totally different than Luciano? I do think that the language in paragraph 22 speaks to knowledge and does not embrace the Luciano standard. That's on my reading of Dismuke, but even setting that case aside and setting aside Thomas that also applies the Dismuke knowledge of the possibility language from paragraph 22, looking even just at the statute and performing statutory construction, I think it's really important to look at subsection A together with subsection B. And that's something to which the state has offered no reply either in briefing or an argument. In subsection B, it talks about whether the several offenses are known. And the question is not what knowledge means, but what does the several offenses mean? And in order to answer that question, we have to look at subsection A. There's Supreme Court case law that tells us that the subsections of a statute are to be read together when they're connected to one another. And here, the phrase the several offenses has no coherent meaning apart from subsection A, which indicates that what the several offenses means is the more than one offense that may be established by the same conduct of the defendant. And so reading subsection A and subsection B together provides a standard for knowledge that is more consistent with the legislative intent as expressed in section 3.3. Luciano? Well, you seem to be making a distinction between, and you did this in your brief, between evidence and conduct. But isn't this a distinction without a difference? How can there be conduct without evidence of that conduct? Certainly, the distinction between evidence and conduct is what the state focuses on in its reply. I think the more important distinction is the may establish the commission language from subsection A. May establish. So here we have that may word again that we saw in paragraph 22 of Dismuke. But may establish. It expresses possibility. It doesn't express that the state has to have a certain amount of evidence already at that time in order to trigger compulsory joinder. It says, what does the state know about the defendant's conduct at the time of the commencement of the prosecution? If what the state knows at that time may establish the commission of more than one offense, then compulsory joinder applies. And that's the statutory language from subsection A that needs to be read together with subsection B to give subsection B any coherence and to avoid the absurd result of the kind of trial by ambush that did occur here. This morning counsel has suggested that the record disproves that this was a tactical decision. ASA Jones himself said that this may have been a tactical decision. And I do have a record citation for that. That's at page 215 of the Supplemental Report of Proceedings. That's ASA Jones acknowledging that the state used this as a way to keep the defendant in trial for longer, to delay trial, and to give it this extra time to do whatever it felt it needed to do. The continuances to which defendant agreed were continuances on the charges that she was actually facing, not charges that she was not facing. That's the whole point of the Williams rule. So the Williams rule tells us that the defendant's agreement to continuances is only agreement to continuances on the charges that she's facing when she agrees. Here it's almost as though counsel for the state is suggesting that Ms. McBride should have been preparing for trial on a charge that was not brought against her. All along, all during this time, she should have been preparing for a completely different, very serious charge that the state had chosen not to bring as late as 27 days before trial. And the Williams rule roundly refutes that suggestion. The defendant has the right to a speedy trial on the charges that she has been actually charged with. And her agreement or even her seeking of continuances on the other charges has absolutely no bearing on the question before this court, which is whether her right to a speedy trial was violated by the very, very late and delayed addition of this aggravated DUI charge that was an admitted tactical decision by the state. A couple other corrections that I have to address here based on the state's argument this morning. The avowal was silent as to whether the a vowel portion of the hearing talks about THC. The vowel was limited to the content of the document as it was relayed by ASA Jones. And the actual phrasing that defense counsel used in accepting the avowal was, I do not have a dispute with respect to what the document says as relayed by ASA Jones. And ASA Jones said the drug screen was negative. He did not say THC. He did not say it was tested for. He did not say, and we became aware of these results at any particular time. So there is no- Counsel, let me stop you there. So the state's attorney would have needed to have said that drug screen was negative for THC, for alcohol, for cocaine, for heroin. I mean, I don't quite follow that. How far does the prosecutor have to go? Well, insofar as the state's attorney wanted evidence of a negative THC result to be before the court, and insofar as he wanted to present that evidence through an avowal as opposed to the document itself, it would have been his duty to include that in the avowal that he asked defense counsel to agree to. There would have been no need to list a long line of negative results for drugs that he was not charging the defendant with driving under the influence. He could have simply said if he wanted the court to have evidence of a negative THC result, he could have said the drug screen tested for THC and came back as negative for THC. And it would have been as simple as that. It also could have been done to just offer the document itself. And instead, the state's attorney, for whatever reason- Well, so it would be unreasonable to interpret the drug screen was negative and that would mean that negative for all drugs, alcohol, and any illegal drug. That would be an unreasonable interpretation of the language. I don't know if I worded that well, but hopefully you followed it. I do. I don't think it would necessarily be unreasonable, but it would, as state's counsel has said this morning, it would require a presumption. It would require this court to presume something that's not in the limited record at this time. And I think it is important that the entire question of whether compulsory joint or apply to this charge hinges on what the state knew and when the state knew it. And so in that regard, this court is limited to what's in the record. And this record is silent as to whether the hospital drug screen included or did not include THC. So I don't think this court needs to presume either direction, whether it did or not, in order to determine whether the trial court abused its discretion in determining that what the state knew and when the state knew it here was enough to trigger the requirements of compulsory joinder, especially in light of the extraordinary delay between the state's receipt of the THC positive results and its bringing up the charges here. Maybe the state would, instead of saying it required a presumption, simply say it was a reasonable inference. What would your response be to that? Presumption versus inference. Well, I don't think it really makes that much of a difference for this court's purposes in reviewing because the inference would have been the trial courts to make. This is a question of fact. And so the only question before this court is whether the trial court abused its discretion in determining that what the state knew and when the state knew it was sufficient to trigger compulsory joinder here. Another thing that I have to correct this morning is the suggestion that Sykes also involved an admission by the defendant that was recanted. The admission that was at play in Sykes was that the officer overheard the defendant Sykes tell one of the nurses, I believe, at the hospital that she had drank alcohol. There was no admission to use of drugs in Sykes, none whatsoever. And in Sykes, the state actually did bring DUI alcohol charges against the defendant straight away based on her admission and based on the observation of classic signs of alcohol intoxication, bloodshot eyes, odor of alcohol, slurred speech, et cetera. So the state did bring those charges right away because even though it DUI alcohol, it did not have an admission to use of drugs. It did not have observation of objective signs of intoxication of drugs as opposed to intoxication by alcohol. And it did not have any sort of other indication to support a suspicion, just a bare suspicion standing alone that the defendant had driven under the influence of drugs as opposed to alcohol. And so that's why Sykes came out differently than this case did. Sykes is absolutely distinguishable on those grounds because here, again, we have the admission. We have two officers' testimony as to observing signs of intoxication or of being under the influence of some drug. And you have the collection of the samples for testing, which the state obviously intended to do. Looking again at subsection A together with subsection B of section 3, I think that this court should conclude that Luciano got it wrong and that the correct standard for section 3.3 is knowledge of the possibility of additional charges is enough, particularly in cases involving delay in investigation, like dismute or delay in charging once you have the evidence like Thomas. The sheer passage of time here is stunning. Counsel for the state has suggested that COVID had something to do with it. There's nothing in the record to support that suggestion that COVID would have somehow prevented the state from acting on test results that it had for 13 months to bring charges through and amended information. I had one other question. I know time is running out. Are you saying that this court has to find a different standard for knowledge in order to affirm the trial court? No. I think that this court can affirm under either the Luciano standard or the standard that would come more clearly from the language of the statute, as I've suggested in my alternative argument. So it's two different paths to the same conclusion. I offer the second path really only because I think it's more consistent with the legislative intent as expressed in section 3.3. It leads to the more just result. It discourages the kind of gamesmanship that occurred in this case, the admitted tactical decision that the state made here. I believe it's the better standard, but even under the Luciano standard, this court should affirm. Thank you. Thank you. Thank you. Mr. McNeil, do you have any rebuttal? Yes, Your Honor. There aren't two different standards. And if we assume, quote, knowledge of the possibility of additional charges, even if we say that's a new standard, there was not the possibility of additional charges in this case due to the negative drug test that the prosecutor talked about. I want to quote what the prosecutors stated at the motion hearing. If we need to mark the report and introduce it as an exhibit, I can do that. But I can make that same avow to the court and defense counsel. I'm not lying about it, Your Honor. It's right in the report. Her drug screen is negative. That's from Blessing Hospital on August 14th, 2020. After that, defense counsel stated he had no dispute with what the test results said and accepted the prosecutor's avow. So what would have prevented the state from bringing these charges regarding drugs at the beginning? They did have some knowledge because of some drug involvement because of what we've talked about, the police officers' observations. Those were in reports. And they actually sent the samples away for additional testing, right? If they hadn't questioned what the initial test was or if they didn't think there was more based on what the evidence was, they probably wouldn't have sent it away. What would have prevented them from using the section of the statute that would allow the state additional time against the speedy trial requirements to ask for additional time from the court? Like I said, the test that they had was negative. They did send or someone sent the University of Illinois Chicago did another test. Presumably, that was a Hail Mary by the state. There's nothing in the record that doubts the validity of that first test. And like I said in my earlier argument, it'd be reckless to... I mean, the most concrete evidence the state had at the time was that defendant wasn't under the influence of THC. But there's a hole there, Mr. McNeil. There's a hole and that is you are presumed or speculating, I'll say, that there is a negative test result. There isn't a negative test result. There isn't? There's a presumption that... Do you have a finding that there's a negative... It was tested THC and it was negative? I would say that the defense counsel accepting the prosecutor's avow and agreeing with that position at this motion hearing should suffice. And like I said, if presuming there was some faultiness in the test or that THC wasn't involved in this drug test, I think defendant would not only not object to putting these reports in the record, they would attach them to their motion themselves. As to Williams, Your Honor, Justice Kavanaugh, I looked that up and it's basically the case law comparison to Section 3-3B as to when offenses are known to proper prosecuting officer at the time of commencing the prosecution. So basically what the state knew at the time and what the state didn't know here, what the state knew at the time of the commencing of the prosecution is that there was a drug test that was negative that was later refuted by the University of Illinois Chicago drug test. Let's go back to Justice Kavanaugh. Way before the avow, the state had some information via the Swarm Report, whatever it was, two officers' testimony that there's evidence of impairment. So at that point, why can't the state file the charge, send off the labs? You can always dismiss charges if you can't afford it. Again, they were refuted by the drug test that night. Presumably, the state didn't want to bring charges they had no chance of securing a conviction on at the commencement of the prosecution. Like I said, there's nothing in the record that there was no reason for the state to bring the charge at that time. There was no reasonable chance to secure a conviction, which is what Luciano says. And I would submit that Dismuke and Thomas don't have a different standard. Again, it's all about whether there's a reasonable chance to secure a conviction at the time of the commencement of the prosecution, which here there clearly was not, and not even an unreasonable chance to secure a conviction based on what the prosecutor avowed and what defense counsel accepted as the prosecutors avowed at the compulsory joinder hearing. And again, the prosecutor correctly pointed out, there is no time limit. Section 3-3 is silent on how long the crucial point in time is the commencement of the prosecution. And here at the time of the commencement of the prosecution, the prosecuting officer did not have sufficient evidence to bring this count 17. Thank you, Mr. McNeil. Thank you, Ms. Kemp. We appreciate your arguments. The case is now submitted and the court stands in recess.